**FREHLING ENTERPRISES, INC. d/b/a Oggetti, Plaintiff,**

v.

**INTERNATIONAL SELECT GROUP, INC. d/b/a Bell'Oggetti International, Ltd., Defendant.**

**No. 96–1486–CIV.**

United States District Court, S.D. Florida.

Dec. 30, 1997.

---

Mark H. Tidman, Baker & Hostetler, Washington, DC, Gaspare J. Bono, Baker & Hostetler, Cleveland, OH, Michael O. Weisz, Albornoz, Segredo & Weisz, Coral Gables, FL, for Plaintiff.

Harley S. Tropin, Adam T. Rabin, Kozyak, Tropin & Throckmorton, Miami, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GRAHAM, District Judge.

**THIS ACTION** came on for trial before the Court, Honorable Donald L. Graham, United States District Judge, presiding, and the issues having been duly tried, pursuant to Fed.R.Civ.P. 52.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1338, 1367, 2201 and 2202 as well as the principles of supplemental jurisdiction. The Court hereby makes Findings of Facts and Conclusions of Law as stated below:

## I. FINDINGS OF FACT

### A. Procedural History

#### 1. Origin Of Dispute

In December 1995, International Select Group, Inc., ("ISG" or "Bell'Oggetti") advertised in *House Beautiful* magazine. Plaintiff's, Frehling Enterprises, Inc. ("Frehling"), president and founder, Robert Frehling, came across the December 1995 advertisement and complained to ISG that its use of the Bell'Oggetti mark was infringing on his Oggetti mark.

On December 14, 1995, Frehling sent a demand letter that Defendant cease its use of the Bell'Oggetti mark and cancel its registration. Frehling filed this lawsuit for trade-

mark infringement and related claims on June 3, 1996.

Plaintiff asserts an exclusive right to use its federally registered trademark "Oggetti." Frehling has used its trademark in connection with furniture, decorative accessories, art objects, gifts, desk accessories, and distribution services for the goods of others in the field of furniture, decorative accessories, art objects, gifts and desk accessories. Defendant, manufactures and distributes, in connection with its registered trademark "BELL'OGGETTI", black metal and tempered glass equipment for furniture engineered to house consumer electronic components.

### B. Claims

Plaintiff has brought this action under § 32 of the Trademark Act of 1946 as amended (the "Lanham Act") 15 U.S.C. § 1114 for infringement of Frehling's trademark; Section 43(a) of the Lanham Act 15 U.S.C. § 1125(a); Florida Statutes Chapters 495, 501 and 817 et seq.; and under the common law of Florida. ISG filed its counterclaims against Frehling on August 19, 1996 for non-infringement of mark and common law dilution of mark.

### C. Frehling's Business

In 1975, Frehling commenced its business distributing decorative furnishings on the wholesale level and selling decorative furnishings on the wholesale and retail levels. In connection with its business in 1975, Frehling adopted the mark Oggetti.

Frehling adopted its mark because at the inception of its business many of its products were manufactured in Italy. Frehling owns and operates its own showrooms in New York, New York, High Point, North Carolina, and Atlanta, Georgia. Frehling's sales have grown over the years, approaching nearly four million dollars for the first time in 1996.

On January 8, 1985, Frehling obtained United States Trademark Registration No. 1,313,990 in connection with "distributionship services for goods of others in the field of furniture, decorative accessories, gifts, and related items." An affidavit under 15 U.S.C. §§ 1058 and 1065 was filed with the U.S. Patent and Trademark Office and was accepted in connection with such registration.

### D. ISG's Business

In 1971, ISG's Vice President of Design, Phil de Carolis ("de Carolis"), began using the Bell'Oggetti mark in his individual capacity in connection with the sale of mirrors, lamps, tables, marble furniture, and other items. He used the name continuously from 1971 to 1989. In 1989, de Carolis suggested that Edward Stravitz ("Stravitz"), the founder of ISG, use the Bell'Oggetti name in connection with the sale of audiovisual furniture. In 1989, Stravitz formed ISG and began using the BELL'OGGETTI mark in connection with the sale of its furniture.

On March 14, 1990, ISG filed an application to register the BELL'OGGETTI trademark with the United States Patent and Trademark Office ("USPTO"). The USPTO denied ISG's application on the grounds that the OGGETTI mark might be confused with the BELL'OGGETTI mark. After further examination, the USPTO ruled in favor of registration of the BELL'OGGETTI mark.

On August 20, 1991, the BELL'OGGETTI trademark registration was published in the USPTO's Official Gazette. On November 12, 1991, the USPTO issued federal trademark registration number 1,664,147 for the use of the BELL'OGGETTI mark in connection with "furniture."

### E. Toll Free Number

In 1994, ISG purchased a toll free number. The toll free number was 1–800–OGGETTI. Every piece of furniture that ISG sold, since approximately September of 1994, included an instruction sheet stating that customers could call the toll free number for customer information. On the instruction sheet the name Bell'Oggetti and 1–800–Oggetti appear.

The customers, however, received the 1–800–Oggetti toll free number only after they purchased the product. Immediately after ISG received the December 14, 1995 demand letter, it ceased the use of sending out the number. However, ISG could not stop using the toll free number because they believed it

would seriously harm the company. Thereafter, ISG printed and distributed the numeric toll free number only.

## II. GENERAL FACTS

### A. Type of Mark

Frehling has a federal service mark registration for "distributorship services for goods of others in the field of furniture, decorative accessories, gifts, and related items." ISG's federal trademark registration is for furniture and not for distribution services.

### B. The Mark

The Oggetti mark and the Bell'Oggetti mark are similar in that they share the word "Oggetti." The word "Oggetti" is derived from the Italian language. The English translation of Oggetti is object. In connection with its fine furniture line, Plaintiff uses the Oggetti mark in conjunction with the word Tavola. In fact, Frehling's fine furniture line is called Tavola or Tavola Collection by Oggetti.

### C. The Products

#### 1. Frehling's Products

Frehling imports and distributes high-end decorative accessories, home furnishings, and furniture. Frehling's furniture is typically made of exotic material such as marble, stone, wood, or shell veneer. Between eleven and fifteen percent of Frehling's business is in the importation of fine furniture. The remaining eighty-five to eighty-nine percent of Frehling's total business is in decorative accessories and home furnishings. None of Frehling's furniture is specifically designed to house consumer electronics. However, Frehling does offer special order custom-made armoires that may be designed to house a television set. In 1995, Frehling sold between five and ten of these custom-made armoires. Frehling's furniture sells at prices starting at $485.00 for a folding trolley to $7,306.00 for a Versailles bombe chest.

#### 2. ISG's Products

ISG manufactures and distributes black metal and tempered glass furniture engineered to house consumer electronic components. ISG's furniture is sold only as "knock downs" or "ready-to-assemble." This means that the consumer must assemble the pre-packaged furniture. ISG's furniture sells at suggested retail prices from $199.95 for a TV/VCR stand to $2,850 for a multi-piece full home theater.

### D. The Retail Outlets

#### 1. Frehling's Trade Channels

Frehling owns and operates its own interior design showrooms in New York, New York, High Point, North Carolina, and Atlanta, Georgia, and a representative's showroom in Los Angeles, California. Frehling also has a network of seven representatives that covers the entire United States. They have twenty showrooms and maintain a presence in every major marketing area where there is a center for design showrooms. These locations include: the D & D Building in New York, the Merchandise Mart in Chicago, and the DCOTA in Dania, Florida. Frehling merchandise is sold to interior designers, decorators, architects, and contractors. Frehling does not sell its products to mass marketers because they believe that it would devalue its product.

#### 2. ISG's Trade Channels

ISG sells approximately ninety-eight percent of its products through audio-video outlets and mass market stores. ISG sells its merchandise to Circuit City, Sound Advice, Nobody Beats the Wiz, HiFi Buys, Harvey Electronics, J.R. Music, and Tweeter.

### E. Advertising Media

#### 1. Frehling Advertising

Frehling has advertised its furniture in magazines such as *Interior Design, Texas Homes, Designer West* and *Architectural Digest.* Frehling does a lot of direct mail advertising. Frehling has a cooperative advertising program where they share the cost of advertising with their dealers. Frehling also advertises in the *New York Times.*

#### 2. ISG Advertising

The major emphasis in ISG's advertising is to place advertisements in magazines geared to audio/video equipment. ISG has adver-

tised in *Audio Magazine, Stereo Review, Audio/Video Interiors, Office World News, Sound and Image, Design Times,* and *House Beautiful.* ISG also uses print media, trade shows, catalogs, dealer advertising, consumer brochures, direct mail, point of sale materials and shelf signs.

In December of 1996, ISG placed advertisements in *House Beautiful* introducing its new line of home office furniture. The advertisement was cross advertising and featured both home office and electronic components in the same room.

In June/July 1997, ISG advertised in *Design Times* magazine, referring to its lines as home office furnishing as well as electronic components. In the *Design Times* advertisement, ISG lists retail dealers in specific geographic areas.

### F. Actual Confusion

#### 1. Frehling's Contention of Actual Confusion

Frehling claims to have produced evidence of two instances of actual confusion. In October 1996, one of ISG's customers allegedly visited the Frehling showroom in High Point, North Carolina and inquired whether Oggetti was related to Bell'Oggetti. The alleged customer was never identified and there were no witnesses to the alleged conversation.

The second incident occurred in November 1996 when a Sprint operator allegedly expressed confusion when a Frehling employee sought to obtain a toll free 1–800–OGGETTI number. The Sprint operator told the Frehling employee that "you already have the number." In fact, ISG was the one who had purchased the 1–800–OGGETTI number.

#### 2. Evidence Of Actual Confusion

The Defendant contends that the Plaintiff has not established any reliable evidence of actual confusion. While evidence of actual confusion is the best evidence of likelihood of confusion, it is not necessary that the Plaintiff have such evidence in order to make a prima facie case for infringement.

### G. Strength of Mark

In the home furnishings area, there are very few consumers that recognize the marks; consumers buy merchandise that they appreciate. Oggetti is not a strong mark in the furniture market and few retail buyers would even recognize it. Generally, the customer does not care about the name unless it is a collectible.

### H. Expert Witnesses

#### 1. Frehling's Expert Witness

Plaintiff produced Gary D. Krugman ("Krugman") to testify as its expert witness. Krugman testified that ISG's expert, Steven Fishkin ("Fishkin"), was incorrect when he stated that there is no way that people could confuse the Oggetti furniture with Bell'Oggetti furniture. Krugman testified that if one accepts Fishkin's testimony then one could never have a case for confusion. The Court does not agree that a finding of lack of confusion in this case mandates the same result in other cases with distinguishable facts.

ISG pointed out that Krugman never looked at an actual product prior to reaching his opinion. He spoke to no customers, and has no idea of what the customer's actual perception is. Krugman did not perform a market place survey, and he did not rely on any actual evidence of confusion. In fact, Krugman found that "any evidence of actual confusion was minimal or suspect" and he did not give it weight in his report or his analysis.

#### 2. ISG's Expert Witness

ISG contends that for four years after ISG registered its mark there was absolutely no confusion between the parties use of their marks. In support of their position, ISG produced Fishkin to testify as an expert in retail merchandising. Fishkin was a furniture industry executive for over 30 years. He began his career at Burdines, and then became a Vice President at Jordan Marsh. Later, he worked at Gimbles as an Executive Vice President in decorative furniture and electronics. He became Executive Vice President at Carson Pirie Scott in Chicago and was in charge of all home furnishings including furniture, electronics, and televisions. He also worked at Montgomery Wards where he was responsible for sales

promotion and advertising of home furnishings.

Fishkin analyzed the Frehling merchandise at Nessa Galla, a decorative home furnishing store in Bal Harbor, owned by the Frehlings. He went to Circuit City and saw the Bell'Oggetti product. He studied the Bell'Oggetti trademark and compared it to the Oggetti trademark. He looked at the advertising for both Frehling and ISG and reviewed the catalogues in which they advertised.

Fishkin concluded that the Frehling product was decorative, fine, and sophisticated. Fishkin described the ISG product as ready-to-assemble furniture that is the top end of a low-end business. He did not find the ISG products to be similar to the Frehling products.

Fishkin testified that these companies do not compete. He believes that they do not target the sale of their products to the same customer. He also testified that they sell their products through different trade channels.

Fishkin concluded, by looking at the amount and type of advertising, that Frehling does not do a lot of print advertising and relies primarily on decorators and interior designers to advertise its products.

### III. CONCLUSIONS OF LAW

#### A. Counts I, II, III and V

Under Counts I, II, III and V, Frehling has brought a cause of action for service mark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125, deceptive and unfair trade practices under Fla. Stat. § 501, and unfair competition under Florida common law.

█ In order to establish a prima facie case for service mark infringement, Frehling must show (1) that its mark has priority; and (2) that ISG's mark is likely to cause consumer confusion. *Lone Star Steakhouse v. Longhorn Steaks*, 122 F.3d 1379 (11th Cir.1997); Lanham Trademark Act, § 32, 15 U.S.C.A. § 1114(1)(a).

█ Although ISG offered some evidence that de Carolis used the Bell'Oggetti mark prior to 1985, the Court finds that Frehling has established the first element and that its

mark has priority. Therefore, the central issue for this Court to decide is whether Plaintiff has established the second element: that the Bell'Oggetti mark is likely to cause consumer confusion. In determining the likelihood of confusion between two marks, the Eleventh Circuit requires this Court to analyze the following seven factors:

(1) type of mark;

(2) similarity of marks;

(3) similarity of the products the marks represent;

(4) similarity of the parties' retail outlets and customers;

(5) similarity of the advertising media used;

(6) defendants intent; and

(7) actual confusion.

*See Dieter v. B & H Industries of Southwest Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989); *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176, 1182 (11th Cir.), *cert denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). Of the seven factors, the type of mark and evidence of actual confusion are the two most important factors. *Dieter* 880 F.2d at 326. However, there are no set rules to determine the amount of evidence of confusion that is sufficient. This Court will consider the circumstances of this particular case. *Id.*

#### 1. The Type of Mark

█ Generally, there are four categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary. *American Television v. American Communications*, 810 F.2d 1546 (11th Cir.1987). When Frehling adopted the Oggetti mark, he intended to create an Italian connotation because at the inception of his business most of his products were manufactured in Italy. The Court notes that the majority of Plaintiff's sales were in decorative accessories or Objects d'Art. The word "objects" is suggestive of and in fact describes, albeit in Italian, a significant number of Plaintiff's products.

Similarly, the Court finds that in choosing the Bell'Oggetti mark, Defendant also intended to create an Italian connotation. In particular, Defendant intended to create an

image of modern Italian design. The Court finds that both the term Oggetti and Bell'Oggetti are suggestive designations and protectable without any showing of secondary meaning.

### 2. Similarity of Marks

In analyzing the similarity of marks, the Court considers the overall impression that the mark creates, including the sound, appearance, and manner in which the mark is used. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 975–76 (11th Cir.1983). Plaintiff and Defendant both use the term Oggetti in their marks. Plaintiff contends that Oggetti is the dominant term in both marks. Defendant, however, produced evidence that in connection with the sale of furniture Plaintiff uses the term Tavola. Tavola appears in large block letters followed by "collection by Oggetti." In the context of this case, however, neither term is dominant.

Thus, the Court finds that the marks are not similar and retailers or consumers are unlikely to believe that Oggetti is associated with Bell'Oggetti. This factor favors the Defendant.

### 3. Similarity of the Products

The products are not similar in either function or design. ISG sells black metal and tempered glass furniture specifically designed and engineered to house electronic components. The ISG products are prepackaged and must be assembled by the purchaser. It is unlikely that one who purchases an ISG product would believe that it is unique.

In contrast, Frehling imports and distributes high-end decorative accessories, home furnishings, and furniture. Frehling's furniture is typically made of exotic material such as marble, stone, wood, or shell veneer. The product is designed and marketed to appear unique. In an effort to establish that the products are similar, the Plaintiff produced evidence that it sells custom-made armoires that may be designed to house television sets. However, the armoires are custom made out of wood rather than ready-to-assemble black metal units like ISG's.

The Court finds that the products are significantly different in function, design, style, and price. This factor favors the Defendant.

### 4. Similarity of the Parties Retail Outlets

Frehling sells its products in Bloomingdales, Macy's, Saks, Burdines, Carson Pirie Scott, Stein Mart, Plunckets, Roche—Dubois, and Theodores. Fishkin testified that these retailers target affluent and sophisticated consumers.

ISG sells the majority of its products in the mass market through retail outlets such as: Circuit City, Sound Advice, and Sears. The products are targeted to less affluent consumers specifically interested in electronics.

Frehling's customers are dealers, designers, and jewelers. Frehling does not sell products to mass marketers. It has never sold merchandise to Circuit City, Sears or Sound Advice.

In the Eleventh Circuit, the Court's analysis must extend beyond the fact that ISG sells its products through Circuit City and Frehling sells its products through Bloomingdales. Therefore, the Court focuses its analysis on the consumer to see if they are confused.

Plaintiff produced no evidence regarding the similarity of retail outlets to indicate that the retail consumer would be confused by ISG's use of Bell'Oggetti. The Court finds that this factor indicates an absence in the likelihood of confusion because the parties used distinct retail outlets and the retail outlets targeted different customers. *Freedom Sav. & Loan Assoc. v. Way,* 757 F.2d 1176, 1184 (11th Cir.1985).

### 5. Similarity of Advertising Media

Frehling advertises in newspapers, magazines, by direct mail, and through a cooperative advertising program. Frehling claims that he first became aware of the Bell'Oggetti name when he opened a complimentary magazine, *Design Times,* that included an advertisement for Bell'Oggetti.

ISG advertises primarily through consumer electronic publications, and audio-visual

trade publications. Therefore, Frehling and ISG do not advertise through the same advertising media.

### 6. Defendant's Intent

 The Plaintiff has not produced evidence to establish the fact that Defendant adopted its mark with the intent to derive a benefit from Plaintiff's reputation. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 977 (11th Cir.1983). However, if a Plaintiff establishes that the Defendant was "intentionally blind" to the benefit, it may be sufficient to weigh this factor in favor of a finding of likelihood of confusion. *Levi Strauss & Co. v. Diaz,* 778 F.Supp. 1206, 1208 (S.D.Fla.1991). Plaintiff points out, however, that Defendant adopted the 1–800–OGGETTI toll free number with full knowledge of Plaintiff's prior ownership rights to the OGGETTI mark. Thus, the Court finds that this factor weighs in favor of Plaintiff.

### 7. Actual Confusion

 Plaintiff claims to have established two instances of actual confusion. Mr. Frehling testified that at a trade show in High Point, North Carolina, an unidentified person inquired whether there was a connection between Oggetti and Bell'Oggetti. This Court admitted this testimony over Defendant's objection under the case of *Armco, Inc. v. Armco Burglar Alarm Co. Inc.,* 693 F.2d 1155, 1161 (5th Cir.1982). In *Armco,* the court allowed similar testimony under 803(3) using the state of mind exception to the Federal Rules of Evidence regarding hearsay. Although the Court allowed the introduction of the testimony, the Court does not place a significant amount of importance on this evidence because it is *highly unreliable* in nature. There were no witnesses to the conversation and the Plaintiff could not identify the declarant by name. Moreover, he could not show any actual confusion on the part of the declarant. This incident is not sufficient to show actual confusion.

Frehling also testified that an employee called Sprint Telephone Company to inquire about purchasing a toll free 1–800–OGGETTI number. The Sprint operator allegedly stat-

ed that the Plaintiff already had the 1–800–OGGETTI number. Frehling contends that this indicates confusion because ISG was the actual owner of the 1–800–OGGETTI number. Under *Armco,* this evidence is inadmissible because it is double hearsay.[1] While the Court would allow the Frehling employee to testify regarding the conversation she had with the Sprint Operator, the Court will not place any weight on Frehling's testimony regarding an alleged third party conversation between a Sprint Operator and a Frehling employee.

### B. Count IV: Fla. Stat. § 817.41 Misleading Or False Advertising

 In order to prove that ISG violated Florida's misleading advertising statute, Plaintiff must prove reliance on alleged misleading advertising, as well as each of the other elements of common-law tort of fraud in the inducement. *Smith v. Mellon Bank,* 957 F.2d 856 (11th Cir.1992). Plaintiff must show that Defendant made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. In addition to showing reliance, Plaintiff must also prove detriment. *Vance v. Indian Hammock Hunt & Riding Club, Ltd.,* 403 So.2d 1367 (Fla.App. 4Dist.1981). Plaintiff has failed to prove that ISG has engaged in false or misleading advertising. Therefore, the Court concludes that Defendant has not violated Fla. Stat. § 817.41.

### C. Counts VI and VII: Fla. Stat. 495.151 and Dilution of Frehling's Mark

 Under Fla. Stat. § 495.151, the Plaintiff must show that Defendant's mark caused "a likelihood of injury to the business reputation or dilution of the distinctive quality" of the Oggetti mark. In *Freedom Sav. & Loan Assoc.,* the court held that when a plaintiff fails to establish diminished commercial value it will result in a finding that the defendant did not dilute the mark. Plaintiff testified that he believed that the Bell'Oggetti mark injured his business reputation, however, he produced no evidence to support the

---

**1.** Even if the Court had admitted this evidence, it would not constitute evidence of actual confusion because the operator was not a consumer and

did not express confusion regarding the purchase of the parties' products.

**1452**

accusation. Defendant's expert witness, Fishkin, testified that the Oggetti name was not distinctive because it has minimal consumer recognition. The Court finds in favor of Defendant and concludes that Defendant has not violated Fla. Stat. § 495.151 or Florida common law for dilution of Plaintiff's mark.

### D. Bell'Oggetti's Defense of Laches

 Under 15 U.S.C. § 1115 and Florida law, ISG must establish the following elements to assert a valid defense for laches: (1) Frehling delayed in asserting the claim, (2) that the delay was not excusable, and (3) there was undue prejudice to ISG. *SunAmerica Corp. v. Sun Life Assur. Co. of Canada,* 77 F.3d 1325, 1347 (11th Cir.1996). The Court finds that while Plaintiff did in fact delay four and one half years in asserting its claim, the delay is excusable. The delay is excusable based on the Courts finding that Plaintiff and Defendant conducted business through different trade channels and competed in different markets. Based on this finding, it is reasonable that Defendant could operate its business for 4½ years without Plaintiff becoming aware of Defendant's presence. Once Plaintiff discovered that Defendant was using the Bell'Oggetti mark the Plaintiff immediately filed suit. Therefore, the equitable doctrine of laches is inapplicable to the instant case.

### CONCLUSION

The Eleventh Circuit has held that a plaintiff may establish the likelihood of confusion absent actual confusion, or surveys, if the remaining elements are sufficiently strong enough to establish confusion. However, in this case Frehling has failed to produce evidence sufficient to establish the requisite element of likelihood of confusion.

In light of the above analysis, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff Frehling shall take nothing from Defendant, ISG;

2. ISG' Trademark Registration No. 1,664,147 is hereby declared valid;

3. All pending motions are hereby DENIED AS MOOT; and

4. The Court hereby retains jurisdiction over this cause to determine the amount of attorney's fees and costs upon proper motion by the parties.