**IBP, INC., Plaintiff,**

v.

**HADY ENTERPRISES, INC., Defendant.**

**No. 3:99–CV–402/LAC.**

United States District Court, N.D. Florida, Pensacola Division.

Feb. 26, 2002.

Robert Anthony Emmanuel, Charles Phillip Young, Emmanuel Sheppard & Condon, Pensacola FL, George W Walker, Mitchel H Boles, Richard H Gill, Copeland Franco Screws & Gill, Montgomery, AL, for Plaintiff.

Danny Lee Kepner, John Bassett Trawick, Susan Adair Woolf, Shell Fleming Davis, Pensacola, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COLLIER, District Judge.

THIS CAUSE came for trial on January 14, 2002 before the Court. The Court's jurisdiction arises under Title 28, United States Code, Section 1332 as this is a civil action between parties of diverse citizenship. *See* 28 U.S.C.A. § 1332 (West 1993).[1] The issues having been duly tried over two days, the Court makes and enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

Plaintiff IBP, INC. (IBP), a Delaware corporation with its principal place of business in South Dakota, is the world's largest beef producer. IBP produces, processes, packages, and labels beef products, including beef livers, for exportation to foreign countries. Since 1977, IBP has supplied beef livers to Egypt. By 1998, IBP was supplying approximately 20 million pounds of beef livers to Egypt annually.

Defendant HADY ENTERPRISES, INC. (Hady Enterprises), an Illinois corporation with its principal place of business in Illinois, is a trading company that exports and imports frozen meat products via the Port of Pensacola in Pensacola, Florida.[2] Hady Enterprises has only two shareholders, Salem Hady and Serag Khodir.[3] Khodir also serves as Hady Enterprises' President and chief officer and Hady serves as Hady Enterprises' director.

In November 1997, the Egyptian Government issued Ministerial Decree 465 (Decree 465). Decree 465 requires that all beef livers exported to Egypt during or after January 1998 be packaged under certain guidelines, including, among other requirements, inserting Arabic-language labels into the beef livers' poly-bags, evincing uniformity with the regulations. Decree 465 requires that the packaging indicates that the animal is slaughtered according to the Islamic rituals of "Halal."[4]

---

1. Although Plaintiff alleges a violation of the Lanham Act, 15 U.S.C. § 1125, Plaintiff has chosen to bring its claim based upon diversity of citizenship (Doc. 49, p. 2).

2. Hady Enterprises operates its Port of Pensacola cold storage facility under the name "Pensacola Cold Storage."

3. At the outset, the Court finds that, based on his demeanor, evasiveness, and contradictory and often outrageous responses, the video deposition testimony of Khodir was beyond belief on every disputed material issue. The Court's finding in this regard is buttressed by, although not dependent upon, Khodir's decision not to appear at trial even though he is Hady Enterprises' majority shareholder, served as Hady Enterprises' Rule 30(b)(6) representative, and claims to be the only individual with authority to act on behalf of the corporation. *See* FED. R. CIV. P. 30(b)(6). Further, although the Court did not admit the deposition testimony of Hady, had the Court

done so, based on internal contradictions, Hady's contradictions with Khodir's testimony, and Hady's evasiveness, the Court would not have credited Hady's testimony on any material fact. This finding is also buttressed by Hady's decision not to attend trial, although he is one of the only two shareholders in Hady Enterprises with an almost 50% interest in the corporation and appears to be the corporation's only director. Therefore, other than facts that are not in dispute or are specifically noted herein, the Court has discounted the testimony of Khodir and Hady as lacking any semblance of credibility.

4. The Court makes this finding based on the testimony of Scott Sanem, IBP Director of Marketing and International Sales, that the particular IBP plants that would produce Decree 465–compliant beef livers had to be inspected by Islamic clerics before processing the meat. Khodir's testimony while evasive, was not contradictory on this point. Khodir

However, other nations, such as Russia, do not require the strict preparation and packaging requirements that the Egyptian government mandated under Decree 465. Therefore, while Decree 465–compliant beef livers would be more than adequate to be sold on the Russian market, beef livers prepared for the Russian market would not meet the strict requirements of Decree 465 and could not be sold on the Egyptian market. Due to the stringent requirements of Decree 465, beef livers sold on the Egyptian market command a higher market price. The Russian market's collapse in August 1998 accentuated the price difference between the markets.

At the times relevant to this action, IBP prepared Halal beef livers at only four of its eleven beef packing plants.[5] During the production process of Decree 465–compliant beef livers, IBP inserts USDA-approved, edible, Arabic-language labels into the poly-bags in contact with the beef livers. IBP did not place edible, Arabic-language labels into the poly-bags of beef livers destined for the Russian market.

In July 1998, Hady Enterprises requested that IBP produce beef livers complying with Decree 465 and provided IBP with a sample of the labels that Hady Enterprises wanted IBP to use when packaging the livers. IBP could not accommodate Hady Enterprises' request because Mirasco, Inc., a company that had served as IBP's primary exporter to Egypt for over twenty years, had already purchased IBP's supply of Decree 465–compliant beef livers.

From approximately June 1998 to August 1998, Hady Enterprises sent IBP purchase orders for 1,034,718 pounds of select beef livers (Pl.Ex. 3).[6] Hady Enterprises stated on the purchase orders that the beef livers were "for Russia" (Id.). Hady Enterprises' purchase of the IBP product represented to IBP that Hady Enterprises would not tamper with the product labels or the boxes, boxes that clearly exhibited IBP's logo (Pl.Ex. 27, Attachs.C, D).[7] Based on Hady Enterprises' representations, IBP filled the orders by packaging, labeling, and processing the livers for Russia. As part of the packaging process, IBP placed straps over the boxes after they were closed. IBP then sent the frozen beef livers to Hady Enterprises' warehouse at the Port of Pensacola in Pensacola, Florida. Each of the 25 loads of beef livers received by Hady Enterprises was accompanied by a separate United States Department of Agriculture, Food and Safety Inspection Services Form 9060–5, Meat and Poultry Export Certificate of Wholesomeness, which showed the country of export designation as Russia (Pl.Exs.2, 22).

When the beef livers reached Hady Enterprises' Pensacola warehouse, at the direction of Khodir, Hady Enterprises employees (which were often day laborers), destrapped and opened the boxes of Russian-destined beef livers.[8] Also at Kho-

recognized that despite "different interpretations," to conform to Decree 465, the animal must be slaughtered according to Islamic law.

5. While only two IBP processing plants produced Decree 465–compliant beef livers at the beginning of the relevant time period, by the end of that period, four IBP plants were producing Decree 465–complaint livers.

6. "Select beef livers" are livers of steers and heifers less than two years of age.

7. Khodir's own trial testimony (via video deposition) confirmed that he believed that

Hady Enterprises' purchase of an IBP product is a representation that Hady Enterprises will not tamper with the labels or alter or tamper with the livers in the boxes.

8. The Court makes these findings based on the testimony of former Hady Enterprises employee Tina Monseau Tallon (formerly Tina Monseau), buttressed by former Hady Enterprises employee Sheri Edgar's (formerly Sheri Green) statement to USDA officials (Pl. Ex. 12).

In a dramatic change of position, Edgar recanted portions of her USDA statement on

dir's direction, the employees re-bagged and re-labeled the beef livers with Arabic-language labels.[9] This process was undertaken by either tearing open the poly-bags while the product was still partially frozen, inserting a label in contact with the product, and rebagging the livers or by cutting a slit in the poly-bags and sliding an Arabic language label into the bag in contact with the product.[10] The employees also placed additional ink stamps on the outside of the plastic bags, which sometimes ran and contaminated the raw livers.[11] As a result of Hady Enterprises' rebagging process, some of the beef livers were exposed to the open air.[12] Other beef livers had torn portions of the IBP poly-bags left attached to the partially frozen beef livers and sealed underneath the new poly-bags.[13] The employees returned the products to the IBP boxes, stamped the boxes and the beef livers with an additional Arabic ink stamp and restrapped the boxes with a strapping machine at the Pensacola facility.[14] Among the changed labels, were the inclusion of Arabic-language labels that stated, "NO. OF SLAGHTER [sic]: I.B.P.," "HALAL SLAUGHTERED, APPROVED BY ISLAMIC AMERICAN SOCIETY," and "NO. OF SLAGHTER [sic]: I.B.P. COMPANY FOR BACKAGING [sic] MEAT" (Pl.Ex. 28). By undergoing this process, Hady Enterprises aimed to present the Russian-prepared IBP beef livers as though they were packaged and processed in compliance with Decree 465, in order to sell the livers at a higher price on the Egyptian market.[15]

Hady Enterprises engaged in other unsavory practices in furtherance of this scheme. Khodir directed employees to complete documents, including filling out new Certificates of Wholesomeness, certifying that the exported products complied

direct examination, including whether the relabeling involved livers intended for Egypt. However, due to Edgar's demeanor and the contradictions between Edgar's testimony and her USDA statement, the Court credits the portion of Edgar's USDA statement that explains that Hady Enterprises engaged in the relabeling procedure to meet the Egyptian requirements. Moreover, The Court discounts the contrary testimony Khodir and, if considered, would have discounted the contrary testimony of Hady. *See supra* note 3.

9. *See supra* note 8.

10. The Court makes this finding based on Monseau's testimony of the relabeling process, Monseau's testimony's similarity to Sanem's testimony describing the alterations to the livers that he inspected in Egypt, and the photographs of the altered beef livers (Pl.Ex. 27, Attachs.C, D).

11. *See supra* note 10

12. *See supra* note 10.

13. *See supra* note 10.

14. The Court makes this finding based on Monseau's testimony that day laborers employed by Hady Enterprises would restrap the boxes after tampering with the livers, Edgar's testimony that the Pensacola facility had the capability to restrap boxes, and Sanem's testimony that the boxes that he observed in Egypt were strapped.

15. The affidavit of IBP employee Danial Brooks, the admissibility of which was stipulated by the parties, could be viewed to suggest that Hady Enterprises' purpose was a malicious attempt to "destroy IBP, [I]nc.'s brand in Egypt" (Pl.Ex. 11). In this affidavit, Brooks discusses a 1996 interaction between Hady, Khodir, and himself culminating in Hady threatening to destroy IBP's brand in Egypt. However, the events that Brooks discusses in his affidavit occurred in 1996, two years before the events leading to this dispute occurred. Because IBP continued doing business with Hady Enterprises for markets other than Egypt, Hady Enterprises attempted to avoid have its relabeling practices discovered, and that Hady Enterprises stood to profit considerably from engaging in these practices, the Court finds that Hady Enterprises' motive was personal greed, not malice toward IBP.

with the laws and regulations of the destination country without examining whether the certificates were accurate, yet representing them as accurate to USDA inspectors (Pl.Exs.9–10).[16] Further, Hady, on Hady Enterprises' behalf, paid an Illinois notary to stamp documents indicating that the livers were Halal slaughtered, giving those documents an added "air of legitimacy" (Pl.Exs.71–73).[17]

After relabeling and repackaging the beef livers, Hady Enterprises exported the livers to Egypt via Hady's exporting business. The beef livers arrived in Port Said, Egypt in October 1998, were inspected by Egyptian authorities, and were unloaded into a cold storage warehouse owned and operated by Hady.[18] In November 1998, an anonymous complaint was made to the Egyptian General Authority for Export & Import Control (GAIEC) about the livers and GAIEC inspected the livers that were in the Port Said cold storage facility. GAIEC determined that the IBP-boxed beef livers in the Port Said storage facility did not comply with Decree 465 and ordered them either exported or destroyed. Hady then exported the shipment to Hol-

land and then to Russia and sold them on the Russian market. Until 1998, IBP had never been made aware of any complaints from Egypt about its beef livers.

On January 6, 1999, the Egyptian government enacted Egyptian Ministerial Decree no. 6, banning IBP from importing any additional products into Egypt. Contemporaneous with the ban, GAIEC issued its official inspection report (Pl.Ex. 18).[19] The report states that GAIEC rejected the liver shipment and, as a result of the shipment, issued Ministerial Decree No. 6, the Egyptian ban of IBP.[20] Further, soon after the ban, IBP correspondence with GAIEC Director Fakhr Eldin Abou El Ezz, made at Ezz's request, summarized the events surrounding the ban (Pl.Ex. 26). The correspondence explains that the IBP ban was based on the rejection of the September 1998 Hady Enterprises shipment of IBP livers, due to improper labeling under Decree 465 (*Id.*).[21]

Since the issuance of the ban, IBP has been unable to sell its products in Egypt. As a result, since January 1999, approximately sixty contracts between IBP and one of IBP's primary customers, Mirasco,

---

**16.** The Court makes this finding based on Monseau's testimony.

**17.** At his deposition, the Illinois notary, Lester Bernstein, identified Hady as the individual that paid him to notarize the documents, demonstrating that Hady's ties to Hady Enterprises extend beyond being a mere director and silent shareholder as he and Khodir contend.

**18.** Had the Court considered Hady's deposition testimony at trial, the Court would have found that after unloading the beef livers, Hady began distributing the beef livers into the Egyptian market place, causing them to reach the Egyptian public.

**19.** The admissibility of this exhibit was stipulated by the parties at trial.

**20.** The Court's reading is buttressed by GAEIC's reference to the livers' production

date as between July and August, which predominately coincides with when Hady Enterprises ordered the livers, June 1998 to August 1998, and IBP delivered them, July 15, 1998 to September 4, 1998 (Pl.Exs.3, 22–23). Hady Enterprises urges a reading of the GAIEC report to state that the livers were rejected *because* of the ban. However, upon examination of the report and the context in which it was created, the Court finds that Hady Enterprises' reading is incorrect.

**21.** The Court also heard evidence that IBP voluntarily curtailed shipments to Korea in September 1997 due to suspicion of e-coli contamination and that negative press existed in Egypt concerning liver shipments. However, the Court finds that these were not causes of the Egyptian ban of IBP. *See* discussion *supra* Part II.B.

could not be filled (Pl.Ex. 28). Moreover, in 1998, the year before the ban, IBP sold approximately 20,000,000 pounds of beef livers prepared and packaged for Egypt via Mirasco. Since the ban's enactment, IBP has undertaken extensive efforts to have the ban lifted.

## II. Conclusions Of Law

IBP has asserted five claims against Hady Enterprises: (1) breach of contract, (2) negligence, (3) defamation and disparagement, (4) tortious interference with contractual relations and (5) false designations of origin, false descriptions, and false representations violating Title 15, United States Code, Section 1125. The Court will consider each in turn.[22]

### A. Breach of Contract

 The first count of IBP's complaint alleges breach of contract. Hady Enterprises concedes that Hady Enterprises' purchase orders for approximately 1,034,718 pounds of beef livers packaged "for Russia" resulted in a contract between IBP and Hady Enterprises (Doc. 162, p. 3).[23] The purchase orders were clearly made "between merchants."[24] The evidence at trial demonstrated—and the Court finds—that, in the meat product trade, when a purchase order speci-

fies a particular country of destination, before diverting the product to a destination other than that specified, the recipient must determine whether the ordered product meets the requirements of the new destination country. Therefore, by not determining whether Egypt would accept products prepared "for Russia," Hady Enterprises breached the terms of its contract as determined by the usage of trade. See FLA. STAT. ANN. § 672.208(2) (West 1993). Further, the evidence at trial demonstrated that Hady Enterprises purchased the product for Russia intending to send it to Egypt, behavior that was dishonest in fact. Since Hady Enterprises was not honest in fact and failed to observe reasonable commercial standards of fair dealing in its trade, Hady Enterprises breached its duty of good faith. See FLA. STAT. ANN. §§ 671.203, 672.103(1)(b) (West 1993) (" 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."). Therefore, the Court finds that Hady Enterprises breached its contract with IBP and, under Count I of the amended complaint, is **LIABLE.**

### B. Negligence

 The second count of IBP's complaint alleges negligence.[25] To establish

---

**22.** With the basis of jurisdiction being diversity of citizenship, Florida law applies to IBP's first four claims, which arise under state law. See Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Keller v. Miami Herald Publ'g Co., 778 F.2d 711, 714 (11th Cir.1985).

**23.** The Court would have made this finding absent Hady Enterprises' concession.

**24.** A "merchant" is defined as:

[A] person who deals in goods of the kind or otherwise by occupation holds himself or herself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her

employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

FLA. STAT. ANN. § 672.104(1) (West Supp. 2002). A transaction "between merchants" is defined as "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." FLA. STAT. ANN. § 672.104(3) (West Supp.2002).

**25.** IBP styles Count II of its complaint "Negligence or Gross Negligence," seemingly in an effort to make a case for punitive damages. Accordingly, the Court will consider the claim as one for negligence and consider the issue of gross negligence when considering punitive damages. See discussion supra Part III.C.

negligence, IBP must prove (1) a legal duty owed by Hady Enterprises to IBP, (2) Hady Enterprises' breach of that duty, (3) an injury to IBP legally caused by Hady Enterprises' breach, and (4) damages as a result of that injury. *See Paterson v. Deeb,* 472 So.2d 1210, 1214 (Fla. 1st DCA 1985); *see also Moransais v. Heathman,* 744 So.2d 973, 975 n. 3 (Fla.1999) (merging the causation and damages elements). In Florida, "a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Fla. Power Corp.,* 593 So.2d 500, 503 (Fla.1992).[26] Whether or not a duty of care arises in a particular case is a question of law. *See Weissman v. Boating Magazine,* 946 F.2d 811, 814 (11th Cir.1991); *McCain,* 593 So.2d at 502.

In *McCain v. Fla. Power Corp.,* 593 So.2d 500, 502–03 (Fla.1992), the Florida Supreme Court addressed the question of foreseeability and how it related to the duty element of negligence. The supreme court noted that a tribunal's minimal threshold objective is to determine whether the defendant's conduct created a foreseeable zone of risk. *See id.* at 502 & n. 1. The court stated:

> Foreseeability clearly is crucial in defining the scope of the general duty placed on every person to avoid negligent acts and omissions.... As we have stated:
>
>> Where a defendant's conduct creates a *foreseeable zone of risk,* the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.
>
> Thus, as the risk grows greater, so does the duty, because the risk to be per-

ceived defines the duty that must be undertaken.

> The statute books and case law, in other words, are not required to catalog and expressly proscribe every conceivable risk in order for it to give rise to a duty of care. Rather, each defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element.
> ... [T]rial and appellate courts cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant.

*Id.* at 503 (footnote and citations omitted). Clearly, the ability to foresee an injury plays an important role in determining whether a duty of care arises.

■ In the instant case, Hady Enterprises ordered the beef livers produced, processed, packaged, and labeled specifically for exportation "for Russia" and the livers included Certificates of Wholesomeness showing the destination country as Russia (Pl.Exs.2–3, 22). The evidence adduced at trial demonstrated that a reasonable person, and certainly a reasonable person in the business of exporting food products to foreign countries, would recognize that beef livers produced, processed, packaged, and labeled for export to Russia would not meet special processing and packaging requirements, such as Decree 465, precluding export and sale to countries with such requirements, such as Egypt. Thus, Hady Enterprises was aware (or should have been aware) that the strict Egyptian requirements of Decree 465 would have precluded the sale of beef livers produced for Russia to Egypt.

---

**26.** Of course, a duty of care may also arise from other sources, such as (1) common law principles and other judicial precedent, (2) statutory authority, (3) contract, (4) a person's status or the relationship between the parties, or (5) the general facts of a case. *See McCain,* 593 So.2d at 503 n. 2.

Further, Hady Enterprises knew (or should have known) that altering the Russian-destined beef livers packaging, relabeling the products, and then selling the beef livers to Egypt in packages indicating that they were produced and packaged by IBP could result in some form of injury or sanction to IBP. Applying the *McCain* standard, Hady Enterprises' conduct placed IBP within a foreseeable zone of risk. Therefore, when Hady Enterprises decided it would sell the beef livers to a country other than Russia, it undertook a duty to determine whether the new export country would accept beef livers that had been originally produced, processed, packaged, and labeled for Russia. Further, when Hady Enterprises altered the beef liver labels and packaging and then attempted to import the beef livers to Egypt, Hady Enterprises undertook an *additional duty* to lessen the risk of injury to IBP or see that sufficient precautions were taken to protect IBP from the harm posed by the risk. *Cf. Fla. Specialty, Inc. v. H 2 Ology, Inc.*, 742 So.2d 523, 525–26 (Fla. 1st DCA 1999) (finding a duty of care arose where a complaint alleged the defendant "had actual or constructive knowledge that their discharge of Brine Plus onto Western Way Circle would harm motor vehicles and that appellees knew Florida Specialty employees drove their cars on Western Way Circle to get to and from work"); *Kowkabany v. Home Depot, Inc.*, 606 So.2d 716, 721 (Fla. 1st DCA 1992) (finding a duty of care).

▪ Hady Enterprises breached its duty to IBP. Rather than exporting the beef livers to a country that accepted beef livers prepared for the Russian market, or taking steps to request that the Egyptian authorities would accept beef livers produced for the Russian market, Hady Enterprises altered the labels in an attempt to subvert the requirements of Decree 465 and sell the beef livers on the Egyptian market. When changing the labels, in ad-

dition to applying ink stamps to the boxes and the individual products, Hady Enterprises mutilated the original IBP packaging of the products. By doing so, Hady Enterprises left some beef livers exposed to the open air and other beef livers in contact with torn remnants of their original packaging trapped underneath their new packaging. Further, in an attempt to capitalize on IBP's goodwill in Egypt, Hady Enterprises included labeling that represented that IBP had packaged the meat and placed the altered beef livers back in the boxes in which IBP shipped them, boxes that exhibited IBP's logo. Hady Enterprises then, without taking steps to protect IBP, exported the product to Egypt where a reasonable person would expect the product to be examined by Egyptian authorities who would reasonably conclude that *IBP* improperly produced, processed, packaged, and labeled the beef livers for Egypt.

▪ Furthermore, Hady Enterprises proximately caused IBP's harm. In Florida, "proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Pope v. Pinkerton–Hays Lumber Co.*, 120 So.2d 227, 231 (Fla. 1st DCA 1960), *cert. denied*, 127 So.2d 441 (Fla. 1961). Proximate cause consists of two elements: cause in fact and foreseeability. *See Coker v. Wal–Mart Stores, Inc.*, 642 So.2d 774, 776 (Fla. 1st DCA 1994). To determine whether cause in fact exists, Florida courts generally follow the "but-for" test: whether there is such a "natural, direct, and continuous sequence between the negligence act [or omission] and the [plaintiff's] injury that it can be reasonably said that *but for* the [negligent] act [or omission] the injury would not have occurred." *Stahl v. Metro. Dade County*, 438

So.2d 14, 17–18 (Fla. 3d DCA 1983) (alterations and emphasis in original); *see also* FLA. STD. JURY INSTR. (Civil) 5.1a (2001).

■■■■ If cause in fact is satisfied, the factfinder must determine whether the injury was foreseeable from the negligence. Foreseeability asks "whether the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct." *Gibson v. Avis Rent–A–Car System, Inc.*, 386 So.2d 520, 522 (Fla. 1980). Even when caused in fact by the defendant's negligence, a defendant is protected from liability where an injury is "highly unusual, extraordinary, or bizarre, or, stated differently, seems beyond the scope of any fair assessment of the danger created by the defendant's negligence." *Tieder v. Little*, 502 So.2d 923, 926 (Fla. 3d DCA 1987). Florida law "does not impose liability for freak injuries that were utterly unpredictable in light of common human experience," since such freak injuries would be "utterly unforeseeable." *McCain*, 593 So.2d at 503–04. However, causation is not equivalent to clairvoyance, as "it is immaterial that the defendant could not foresee the *precise manner* in which the injury occurred or its *exact extent*." *McCain*, 593 So.2d at 503 (emphasis added).

■■■■ "A person who has been negligent, however, is not liable for the damages suffered by another when some separate force or action is 'the active and efficient intervening cause,' the 'sole proximate cause,' or an 'independent' cause." *Gibson*, 386 So.2d at 522. An independent efficient cause is a cause that comes into effect after the defendant's negligence, unrelated to that negligence, that breaks the sequence of events between the negligence and the injury. *See Pope*, 120 So.2d at 230. "If an independent efficient cause intervenes between the negligence and the injury, and the original negligence does not directly contribute to the force or effectiveness of the intervening cause, the original negligence is not regarded as a proximate cause of the injury, even though the injury might not have occurred but for the original negligence." *Pope*, 120 So.2d at 231. However, one who is negligent and whose conduct "sets in motion" the events resulting in the plaintiff's injury, is not absolved of liability. *See Gibson*, 386 So.2d at 522.

■■■■ In the instant case, cause in fact has been satisfied. Solely as the result of Hady Enterprises' shipment's failure to conform to Decree 465, the Egyptian government enacted Egyptian Ministerial Degree no. 6, banning IBP from importing any additional products into Egypt. The Court makes this determination for three reasons, each of which would alone suffice for the Court to find causation by a preponderance of the evidence. First, the timing of the series of events led the Court to find that IBP has met its burden of establishing causation. Second, the Egyptian GAIEC official inspection report states that GAIEC rejected the liver shipment and, as a result of the shipment, issued Ministerial Decree No. 6, the Egyptian ban of IBP (Pl.Ex. 18). Third, IBP's correspondence with GAIEC Director Fakhr Eldin Abou El Ezz demonstrates that the IBP ban was based on the rejection of IBP livers, due to improper labeling under Decree 465, exported in September 1998 by Hady Enterprises and imported into Egypt by Salem Abdel Hady (Pl.Ex. 26). The Court finds that but for Hady Enterprises' relabeling, repackaging, and exportation of the beef livers to Egypt, Egypt would not have sanctioned IBP.

■■■■ Furthermore, foreseeability is satisfied. A reasonable person, and certainly a reasonable person in the trade, would recognize when Hady Enterprises—which

is not normally responsible for packaging beef livers—relabeled, repackaged in IBP boxes, and exported beef livers to Egypt in a manner that violated Decree 465, Hady Enterprises placed IBP—the company that initially packaged and is typically responsible for the packaging of the product—in the scope of danger of being sanctioned by Egypt. While, in this case, the exact extent of that sanction was quite severe, the severity of the sanction neither makes IBP's harm unforeseeable nor absolves Hady Enterprises of liability. *See McCain*, 593 So.2d at 503. The Egyptian government's decision to sanction IBP was within a fair assessment of danger of Hady Enterprises' negligence. *See Tieder*, 502 So.2d at 926. That Egypt's chosen sanction was a complete ban, while unlikely, was not so "freakish" as to be an unforeseeable consequence of Hady Enterprises' actions. *McCain*, 593 So.2d at 503–04.

 Additionally, there are no independent efficient causes that break the causal chain. Hady Enterprises questioned IBP's witnesses about two alleged independent efficient causes: IBP's September 1997 voluntarily curtailment of shipments to Korea due to suspicion of e-coli contamination and negative press in Egypt concerning liver shipments. However, the Court finds that the September 1997 Korean shipments were too attenuated in time and geography to have an effect on the Egyptian government's decision to ban IBP in January 1999. Furthermore, the negative Egyptian press was about the industry generally, not IBP.[27] Therefore, the Court determines that Egypt's decision to ban *only* IBP, but no other beef producers, was unrelated to the negative Egyptian press.

Based on the foregoing, as to Count II of the amended complaint, the Court finds Hady Enterprises **LIABLE.**

## C. Defamation

In Count III of its complaint, IBP alleges Hady Enterprises defamed IBP by attempting to import and sell the beef livers to buyers in Egypt after changing the labels on the beef livers.

 In Florida, defamation encompasses both libel and slander and has been defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla. 4th DCA 1983). In order to recover for defamation, a plaintiff must prove the following elements: (1) a false or defamatory statement concerning the plaintiff, (2) published by the defendant to a third party, and (3) the plaintiff suffered damages as a result of the publication. *See Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F.Supp.2d 1333, 1344 (S.D.Fla.1998); *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F.Supp. 1539, 1541 (M.D.Fla.1993), *aff'd*, 15 F.3d 1097 (11th Cir.1994). Whether a statement is defamatory or not is a question of law. *See McIver v. Tallahassee Democrat, Inc.*, 489 So.2d 793, 794 (Fla. 1st DCA 1986).

 If a court concludes that a statement is defamatory, the next question it must determine is whether the statement is actionable *per se* or *per quod*. *See Owner's Adjustment Bureau, Inc. v. Ott*, 402 So.2d 466, 468 (Fla. 3d DCA 1981). Statements that are actionable *per se* are those which degrade a plaintiff, bring her into ill repute, or cause similar injury without innuendo. *See Keller v. Miami Her-*

---

27. The Court makes this determination based on Sanam's testimony to that effect. The Court also notes that Hady Enterprises did not enter the negative Egyptian press statements into evidence for the Court to examine.

*ald Publ'g Co.*, 778 F.2d 711, 716 (11th Cir.1985); *O'Neal v. Tribune Co.*, 176 So.2d 535, 541 (Fla. 2d DCA 1965). Statements actionable *per quod* are those whose meaning is not readily apparent and require innuendo. "'Innuendo' simply means that facts extrinsic to those published must be known in order to inflict an injury." *Boyles v. Mid–Florida Television Corp.*, 431 So.2d 627, 633 (Fla. 5th DCA 1983). Statements actionable *per se* are injurious on their face and do not require the aid of extrinsic proof. *See id.* However, statements actionable *per quod* are not injurious on their face; they require additional proof sufficient enough to supply their defamatory meaning and show how they injured the plaintiff. *See Campbell v. Jacksonville Kennel Club*, 66 So.2d 495, 497–98 (Fla.1953).

■ The labels altered by Hady Enterprises read, "NO. OF SLAGHTER [*sic*]: I.B.P.," "HALAL SLAUGHTERED, APPROVED BY ISLAMIC AMERICAN SOCIETY," and "NO. OF SLAGHTER [*sic*]: I.B.P. COMPANY FOR BACKAGING [*sic*] MEAT." These statements clearly do not constitute libel *per se* as they are not injurious on their face. Indeed, without considering innuendo, they do not subject IBP to prejudice in the proper exercise of its trade, profession, office, occupation or employment.

■ Additionally, IBP does not establish libel *per quod*. The essence of IBP's theory is that Hady Enterprises placed labels on the beef livers, which were not packaged in conformity with Decree 465, that stated that they were packaged by IBP and sent those beef livers to Egypt, where a reasonable person would recognize that Egyptian officials would examine them. Thus, to a person who is aware of the requirements of Decree 465 or the quality of beef livers normally shipped to Egypt under IBP's name, Hady Enterprises libeled IBP. IBP claims that Hady Enterprises' actions imputed to IBP failure to follow the Egyptian packaging regulations, an action that does not conform to the proper exercise of IBP's trade.

IBP's theory goes too far. In this case, while the Hady Enterprises' relabeling contributed to the Egyptian government's decision to ban IBP, even when considered in light of the extrinsic facts, IBP has not proven by a preponderance of the evidence that the *words* on the labels *themselves* were injurious.[28] Therefore, the Court determines that, as to Count III of the amended complaint, Hady Enterprises is **NOT LIABLE.**

### D. Tortious Interference with Business Relations

■ In Count IV of its complaint, IBP alleges that Hady Enterprises tortiously interfered with its business relations. In order to prove tortious interference, IBP must prove (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which IBP has legal rights, (2) Hady Enterprises' knowledge of the relationship, (3) an intentional and unjustified interference with the relationship by the defendant, and (4) damage to IBP as a result of the interference. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla.1994). In order to establish the third element of the *prima facie* case for tortious interference, IBP must show that Hady Enterprises acted with malice or ill will. *See Rockledge Mall Assocs., Ltd. v. Custom Fences of S. Brevard, Inc.*, 779 So.2d 554, 557 (Fla. 5th DCA 2001). The interference must also be direct, not an

---

**28.** Although IBP's Proposed Findings of Fact and Conclusions of Law do not include any finding on disparagement (Doc. 163, p. 9), for the same reason, any claim by IBP for disparagement would also fail.

indirect consequence, of Hady Enterprises' actions. *Lawler v. Eugene Wuesthoff Mem. Hosp. Ass'n,* 497 So.2d 1261, 1263 (Fla. 5th DCA 1986).

The evidence adduced at trial demonstrated that Hady Enterprises did not intentionally interfere with IBP's business relationship with Mirasco. Hady Enterprises' intention was to avoid detection by the Egyptian authorities in order to allow the beef livers to enter the Egyptian market, not to frustrate the business relationship between IBP and Mirasco. Hady Enterprises' frustration of the IBP/Mirasco relationship was not intentional, much less undertaken with the malice or ill will against IBP necessary to establish a tortious interference claim.

Furthermore, Hady Enterprises did not directly interfere with the IBP/Mirasco relationship. Hady Enterprises sent mispackaged beef livers to Egypt and the Egyptian government banned IBP from the Egyptian market, frustrating the IBP/Mirasco relationship. The Egyptian ban *directly* interfered with the IBP/Mirasco relationship; Hady Enterprises' tampering with the beef livers and shipment of the livers to Egypt did not. Therefore, as to Count IV of the amended complaint, the Court finds that Hady Enterprises is **NOT LIABLE.**

---

**29.** Generally, trademark law, including the Lanham Act, does not apply to the resale of genuine, trademarked goods by someone other than the trademark owner. *See Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107 (4th Cir.1991) (citing *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987)). However, since use of a trademark "implies that the product has been delivered according to all quality control guidelines enforced by the manufacturer," a "materially different product is not genuine" and its unauthorized sale implicates trademark law. *Id.* at 108; *Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1302 (11th

**E. Use of False Designations of Origin, False Descriptions, and False Representations (Lanham Act, 15 U.S.C. § 1125)**

In Count V of its complaint, IBP alleges that Hady Enterprises used false designations of origin, false descriptions, and false representations of the beef livers, in violation of the Trademark Lanham Act, as codified under Title 15, United States Code, Section 1125. That section provides, in relevant part:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which,—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125 (West 1993).[29]

In order to succeed on a Lan-

---

Cir.2001). The product includes a "material difference" if a difference that a consumer would deem relevant in deciding whether to purchase the product exists between the original and the altered products. *Id.* In the instant case, Egyptian authorities deemed whether a beef liver complied with Decree 465 relevant to their decision allow the product to reach the consumer. Moreover, whether a product conforms with a cultural dietary restriction, like Halal, would be a "material difference" since common experience dictates that consumers that follow such restrictions, such as the Egyptian public, deem them relevant in deciding to purchase a product.

ham Act claim, the plaintiff must establish three elements. First, that "its mark is inherently distinctive or has acquired secondary meaning," second, that "its mark is primarily non-functional," and third, that "the defendant's mark is confusingly similar." *Univ. of Fla. v. KPB, Inc.,* 89 F.3d 773, 776–77 (11th Cir.1996). The first and second elements are not contested by the parties and are easily satisfied on the facts.[30] As to the third element, "the plaintiff must show that the defendant used the mark in commerce without its consent and that the unauthorized use was likely to deceive, cause confusion or result in mistake." *Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1300–01 (11th Cir.2001). Whether a likelihood of confusion exists is the only disputed issue among the parties (*See* Doc. 162, p. 9–10). So, as with most cases, the instant case "boils down to the existence *vel non* of 'likelihood of confusion.'" *Id.* at 1301 (citing *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1538 (11th Cir.1986)).

■ Generally, courts determine "likelihood of confusion" by considering whether "there is a likelihood of confusion in the mind[s] of an appreciable number of 'reasonably prudent' buyers" as to the origin, sponsorship or approval of the goods. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 979 n. 22 (11th Cir. 1983) (quoting 2 J.T. McCarthy, Trademarks & Unfair Competition § 23:27, at 87–88 (1973)). However, in rare cases, another party determines whether or not actual buyers will have access to the prod-

uct. *See id.* In such a case, the end purchasers can only see, and thus, only choose from, those products to which they have been given access. *See id.* The end customer is simply not presented with an opportunity to choose the product in question. *See id.* In such a case, the court looks to the "likelihood of confusion" caused by the mark or designation in the party that selects the goods that an end customer may purchase. *See id.*

In the instant case, the altered IBP beef livers were not delivered to the Egyptian consumers because the Egyptian authorities intercepted the livers and determined that they did not comply with Decree 465. Therefore, the Egyptian authorities did not allow the beef livers to enter the Egyptian market. However, because Hady Enterprises packaged the altered livers in IBP boxes, exhibiting the IBP logo, Egyptian authorities banned IBP's products from Egypt.

■ In order to determine whether there is a likelihood of confusion, a court considers a series of factors. They include (1) the type of mark; (2) the similarity of design; (3) the similarity of products or services; (4) the identity of purchasers and similarity of retail outlets; (5) the similarity of advertising campaigns; (6) the defendant's intent; and (7) actual confusion. *See Freedom Sav. & Loan Ass'n v. Way,* 757 F.2d 1176, 1182–83 (11th Cir.1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985).

---

**30.** First, the IBP logo, is "unique or unusual in a particular field." *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir.1986). The IBP logo is composed of the letters "IBP" written in the particular color and font on IBP products, boxes containing those products, and corporate letterhead (Pl. Exs. 27, Attachs. C, D; 52). The IBP logo is an arbitrary and inherently distinctive mark used to identify origin, production, and sponsor-

ship by IBP. *AmBrit, Inc.,* 812 F.2d at 1536–37. Second, the IBP logo is primarily non-functional since the logo "affords [no] benefits ... apart from any benefits attributable to the [mark's] significance as an indication of source ...." *Univ. of Fla.,* 89 F.3d at 776 n. 6 (third alteration in original) (quoting *Restatement (Third) of Unfair Competition,* § 17 (1994)).

### 1. Type of Mark

The Court first considers whether the mark is a "strong" or "weak" mark. "[T]he strength and distinctiveness of plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded. Strong marks are widely protected, as contrasted to weak marks." *John H. Harland Co.*, 711 F.2d at 973 (internal quotations omitted). As discussed above, the mark on the boxes of altered beef livers, the letters IBP, written in the particular color and font in which they are exhibited, is an arbitrary and distinctive mark used to identify products originating at, produced by, and sponsored by IBP. *See AmBrit Inc.*, 812 F.2d at 1536–37. Hady Enterprises did not assert any other extensive third party usage. Thus, IBP's mark is entitled to great protection.

### 2. Similarity of Design

The mark used by Hady Enterprises to package the altered beef livers is IBP's exact logo, the logo it uses to demonstrate its sponsorship of its products and their IBP origin. Since the marks are identical, this factor leads to a finding of a likelihood of confusion. *See Gen. Electric Co. v. Speicher*, 877 F.2d 531, 534–35 (7th Cir. 1989), *reh'g denied* (finding that use of another's mark makes "danger of confusion ... even greater because the 'imitation' is not merely colorable, but perfect").

### 3. Similarity of Products

"The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co.*, 711 F.2d at 976 (quoting *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 505 (5th Cir.1980)).[31] The evidence at trial demonstrated that Hady Enterprises

altered the packaging of an original IBP product destined for the Russian market. Although the beef livers destined for Egypt were Halal slaughtered and packaged differently than Russia-destined beef livers, the product themselves have a very similar appearance. The products are sufficiently similar to weigh this factor in favor of a finding of a likelihood of confusion.

### 4. Identity of Purchasers and Similarity of Retail Outlets

■ "Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception." *John H. Harland Co.*, 711 F.2d at 976 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.1980)). The beef livers sold by IBP to Mirasco (which were originally produced as Decree 465–compliant) were intended for, and previously sold on, the Egyptian market. The beef livers altered by Hady Enterprises were sent to Egypt to also be sold on the Egyptian market. Other than the Egyptian importer, Hady Enterprises used the same distribution channels and targeted the same consumers as IBP, also weighing in favor of a finding of a likelihood of confusion.

### 5. Similarity of Advertising Campaigns

Neither party has provided evidence of similarity of advertising or use of the same advertising media. Accordingly, this factor weighs in favor of Hady Enterprises.

### 6. Defendant's Intent

■ If "a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of

---

**31.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.' " *John H. Harland Co.*, 711 F.2d at 977; *see also Sun Banks v. Sun Fed. Savings & Loan Ass'n*, 651 F.2d 311, 318–19 (5th Cir. July 20, 1981) ("That a latecomer adopts another's name or mark, deliberately seeking to capitalize on the other's reputation and benefit from the confusion, is an important factor for any court."). In this case, the Court finds that Hady Enterprises specifically intended to capitalize on IBP's name recognition by repackaging the altered beef livers into their original IBP boxes and restrapping the boxes to make them appear as though they had been Halal slaughtered, and were packaged and sponsored by IBP. Hady Enterprises intended to utilize IBP's reputation and goodwill to import the altered beef livers, which were not produced or packaged in compliance with Decree 465, into the Egyptian market to profit from those sales. Hady Enterprises' intent to benefit from IBP's reputation and goodwill weighs strongly in favor of finding a likelihood of confusion.

### 7. Actual Confusion

■ "Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *John H. Harland Co.*, 711 F.2d at 978 (quoting *Amstar Corp.*, 615 F.2d at 263). IBP has presented evidence that would lead the Court to conclude that the Egyptian authorities were actually confused. After the beef livers were taken into Port Said, the Egyptian authorities rejected them as failing to comply with Decree 465. As the result of the shipment, the Egyptian government issued Ministerial Decree No. 6, the Egyptian ban of IBP. The Egyptian government decided not to ban Hady Enterprises or

Hady, individually, from exporting and importing products to Egypt, but rather, to ban IBP. The circumstances clearly indicate that the Egyptian government attributed IBP with the faulty packaging and the government was actually confused by Hady Enterprises' use of IBP's logo on the non-compliant beef livers. Accordingly, the actual confusion factor weighs in favor of a finding of a likelihood of confusion.

After analyzing each of the factors, the Court finds that Hady Enterprises' repackaging of altered IBP beef livers into boxes exhibiting the IBP logo created a likelihood of confusion among the Egyptian government as to whether IBP produced, packaged, and sponsored the beef livers. IBP has a strong mark and Hady Enterprises' use of the IBP boxes exhibiting the IBP logo makes the similarity in use identical. Further, the products sold and the purchasers targeted are very similar. Although no evidence was presented of advertising media, there is strong evidence that Hady Enterprises' use of IBP's logo was to benefit from IBP's established reputation. Moreover there is evidence of actual confusion. Accordingly, the Court finds that Hady Enterprises' use of IBP's boxes to package the altered beef livers—falsely describing the beef livers as Halal slaughtered and Decree 465–packaged, and falsely designating their origin at and sponsorship by IBP—created a likelihood of confusion. As a result, the Court finds that, as to Count V of the amended complaint, Hady Enterprises is **LIABLE**.

### III. Damages

#### A. Compensatory Damages

■ As compensatory damages, IBP seeks lost profits that have already accumulated.[32] Lost profits are only recoverable if their loss is proved with a reasonable degree of certainty. *See Douglass Fertilizers & Chemical, Inc. v.*

---

**32.** IBP also seeks costs of efforts to lift the ban and loss of goodwill. However, IBP did not provide the Court with sufficient evidence to properly determine the amount of damages.

*McClung Landscaping, Inc.*, 459 So.2d 335, 336 (Fla. 5th DCA 1984); *Lucas Truck Service Co. v. Hargrove*, 443 So.2d 260, 262 (Fla. 1st DCA 1983); 17 FLA. JUR.2d *Damages* § 78. "While an inability to provide an exact or precise amount [of lost profits] will not preclude recovery, *Electro Services, Inc.* [*v. Exide Corp.*, 847 F.2d 1524, 1527 (11th Cir.1988) (citing Florida law) ], the evidence must establish lost profits with reasonable certainty such that an impartial and prudent mind would be satisfied." *Clayton v. Howard Johnson Franchise Systems, Inc.*, 954 F.2d 645, 652 (11th Cir.1992) (citing Florida law). "If it is clear that substantial damages have been suffered, the impossibility of proving its precise limits is no reason for denying substantial damages altogether." *Twyman v. Roell*, 123 Fla. 2, 7, 166 So. 215, 218 (1936). Further, lost profits are only allowed if the court is satisfied that the wrongful act of the defendant caused the loss of profits. *See* 17 FLA. JUR.2d *Damages* § 78; *Douglass Fertilizers & Chemical, Inc.*, 459 So.2d at 336. In order to establish lost profits, the fact finder looks to evidence of "proof of income [less] expenses for a reasonable period of time prior to the breach." *Born v. Goldstein*, 450 So.2d 262, 264 (Fla. 5th DCA 1984). Additionally, to recover lost profits based on a breach of contract, the plaintiff must also establish that the profits were reasonably in the contemplation of the defaulting party at the time of the contract's formation. *See Frenz Enters., Inc. v. Port Everglades*, 746 So.2d 498, 504 (Fla. 4th DCA 1999); *Crain Auto. Group v. J & M Graphics*, 427 So.2d 300, 301 (Fla. 3d DCA 1983); *see also* FLA. JUR.2d *Damages*, § 78.

In the instant case, IBP presented evidence of lost profits of $3,430,000. The evidence established that expenses created "no material difference" in the lost profit figure. Further, IBP's figures did not take into account the premium that its brand usually commands over its competitors, the management time and expenses incurred to lift the Egyptian ban, or sales volume increase prior to the ban. Additionally, with regard to IBP's breach of contract claim, based upon the circumstantial evidence at trial, including Hady Enterprises initial efforts to obtain IBP beef livers for sale to Egypt (Pl.Ex. 11), Hady Enterprises elaborate scheme to export IBP Russian-prepared beef livers to Egypt, and Hady Enterprises efforts to conceal its action, the Court finds that Hady Enterprises intended to breach its contract with IBP at the time the contract was formed. It can be reasonably contemplated that IBP would suffer an Egyptian sanction, such as a ban, due to the breach and lost profits as a result.

Therefore, with regard to each of IBP's claims of breach of contract, negligence, and violations of the Lanham Act, based on the evidence adduced at trial, the Court finds that IBP has established with reasonable certainty that Hady Enterprises' actions caused it to suffer lost profits of $3,430,000.

### B. Future Damages

In addition to those compensatory damages that have already accrued, IBP also seeks future lost profits. IBP argues that it is entitled to future lost profits that will accrue as a continuing result of the Egyptian ban. Like the lost profits that have already accrued, future lost profits must be proved "with a reasonable degree of certainty." 17 FLA. JUR.2d *Damages* § 76; *see Douglass Fertilizers & Chemical, Inc.*, 459 So.2d at 336; *Forest's Mens Shop v. Schmidt*, 536 So.2d 334, 336 (Fla. 4th DCA 1988); *see also Clayton*, 954 F.2d at 652 (applying Florida law) (utilizing "reasonable degree of certainty" standard to lost profits generally). Such an award "cannot be based on mere speculation or conjecture." *Forest's Mens Shop*, 536 So.2d at 336.

Under the circumstances of the instant case, Egypt could lift the ban of IBP at any time. Accordingly, lost profits that have not accumulated prior to the trial of this matter can not be proven with a reasonable degree of certainty as they are entirely speculative and conjectural. Therefore, the Court does not find an award of future damages appropriate.

### C. Punitive Damages

■ Under Florida law, in order to recover punitive damages, a plaintiff must demonstrate to the trier of fact that the defendant is personally guilty of intentional misconduct or gross negligence. *See* FLA. STAT. ANN. § 768.72 (West Supp.2002). The Florida legislature has defined "gross negligence" as conduct which is "so reckless or wanting in care that it constitute[s] a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *See* FLA. STAT. ANN. § 768.72(2)(b) (West Supp.2002).[33]

Further, in a case involving a corporation, punitive damages may be imposed only if clear and convincing evidence demonstrates that the corporation's agent or employee has engaged in intentional misconduct or gross negligence and one or more of the following conditions is satisfied:

(a) The ... corporation ... actively and knowingly participated in such conduct;

(b) The officers, directors, or managers of the ... corporation ... knowingly condoned, ratified, or consented to such conduct; or

(c) The ... corporation ... engaged in conduct that constituted gross negligence and that contributed to the loss damages, or injury suffered by the claimant.

FLA. STAT. ANN. § 768.72(3) (West Supp. 2002).

In the instant case, the clear and convincing evidence demonstrates that Khodir, Hady Enterprises' principal shareholder and primary officer, and Hady, Hady Enterprises' only other shareholder and director, on the behalf of the corporation and for its benefit, engaged in and knowingly condoned and ratified fraudulent actions so reckless as to constitute conscious disregard or indifference to IBP's goodwill and its right to retain control over the quality of its products. Even more disturbing, to complete its scheme, Hady Enterprises, via its principals, repackaged the beef livers in a manner that left portions of the product contaminated by ink and exposed to the open air. By these actions, Khodir, Hady and Hady Enterprises recklessly and consciously disregarded the health and safety of the Egyptian public and any other end consumers of the beef livers. Such fraudulent actions, and the complete disregard for the rights and safety of others, are a prototypical example of the reason punitive damages are an available form of relief in Florida. The Court is shocked and outraged by Hady Enterprises' and its principals' efforts to defraud the Egyptian public and IBP and their reckless abandon for the health of the Egyptian and Russian people. The Court finds, by clear and convincing evidence,

---

**33.** Hady Enterprises points the Court to a series of Florida cases that hold that punitive damages may only be awarded when there has been a showing of "willful or wanton misconduct" (Doc. 162, p. 6–7). *Myrtle Grove v. Taylor,* 614 So.2d 22, 23 (Fla. 1st DCA 1993); *Ten Assocs. v. Brunson,* 492 So.2d 1149, 1150 (Fla. 3d DCA 1986). However,

the cases provided by Hady Enterprises were decided before the Florida legislature's amendment of Section 768.72, which allows recovery of punitive damages based on clear and convincing evidence of "intentional misconduct" or "gross negligence." 1999 Fla. Laws, ch. 99–225, § 22.

that the actions of Hady Enterprises, Khodir, and Hady were grossly negligent and in blatant disregard for the well-being of those who could be harmed by their actions.[34]

The purpose of punitive damages is to "punish the wrongdoer." *See St. Regis Paper Co. v. Watson*, 428 So.2d 243, 247–48 (Fla.1983). However, a punitive award should not bankrupt the defendant. *See id.* at 248. Thus, one of the factors to consider when assessing punitive damages is the financial worth of the defendant. *See id.* at 247. Nevertheless, a showing of the defendant's worth is not required to assess punitive damages. *See Rinaldi v. Aaron*, 314 So.2d 762, 765 (Fla.1975). "If [the] defendant's financial worth is meager it would be to his advantage to introduce such evidence in order to mitigate the damage award." *Id.* The circumstantial evidence presented at trial demonstrates that Hady Enterprises is a corporation that engages in a considerable amount of interstate and international exporting and employs a number of employees. Hady Enterprises presented no evidence of meager financial worth. Based on the evidence presented at trial, the Court awards punitive damages of $1,000,000. This award is made with three aims: First, to punish Hady Enterprises for its conduct, second, to serve as a deterrent to those who would engage in similar conduct, and third, to perhaps persuade the Egyptian government to absolve IBP of liability and place the blame for this scheme at the foot of Hady Enterprises and its principal owners, Serag Khodir and Salem Hady, where fault squarely lies.

## IV. JUDGMENT

a. The Clerk of the Court is directed to enter judgment for Plaintiff IBP, INC.

and against Defendant HADY ENTERPRISES in the amount of $3,430,000 in actual damages and $1,000,000 in punitive damages.

b. If appropriate, motions for attorneys' fees and costs may be filed in accordance with N.D. FLA. LOC. R. 54.1 and 54.2.

## JUDGMENT

This action came before the Court with the Honorable Lacey A. Collier presiding. The issues have been heard and a decision has been rendered.

JUDGEMENT IS ENTERED FOR PLAINTIFF IBP, INC. AND AGAINST DEFENDANT HADY ENTERPRISES IN THE AMOUNT OF $3,430,000.00 IN ACTUAL DAMAGES AND $1,000,000.00 IN PUNITIVE DAMAGES.

---

**34.** Although only gross negligence is necessary for punitive liability, the Court also believes that Hady Enterprises actions arise to the level of willful or wanton misconduct. *See Taylor*, 614 So.2d at 23; *Ten Assocs.*, 492 So.2d at 1149.